## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## DUBLIN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| v. | ) **Civil Case No.** CV324-2 |
| | ) |
| **IN THE MATTER OF THE SEIZURE** | ) |
| **OF ALL FUNDS IN BANK ACCOUNT** | ) |
| **ENDING IN 3006 HELD BY** | ) |
| **CITIZENS BANK OF** | ) |
| **SWAINSBORO AND ALL OTHER** | ) |
| **DEFENDANT PROPERTY** | ) |
| **IDENTIFIED IN PARAGRAPH** | ) |
| **THREE HEREIN** | ) |

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

COMES NOW the United States of America (the "United States" or the "Government"), by and through Jill E. Steinberg, United States Attorney for the Southern District of Georgia, and J. Bishop Ravenel, Assistant United States Attorney, and brings this Verified Complaint for Civil Forfeiture *In Rem*, with the following allegations:

## NATURE OF THE ACTION

1.      *In Rem* civil forfeiture is permissible under Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.

2.      The Defendant *In Rem* is subject to forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C) on the grounds that the Defendant Property, as defined later herein, is property involved in money laundering in violation of 18 U.S.C. §§ 1956 and 1957 or traceable to such property,

and is proceeds traceable to and/or derived from wire fraud in violation of 18 U.S.C.

§ 1343, respectively.

## THE DEFENDANTS *IN REM*

3.    The Defendant *In Rem* (hereinafter, the **"Defendant Property"**)

includes the following assets:

a.    Any and all funds and holdings seized from Citizens Bank of Swainsboro, account ending in 3006, account in the name of Heartland Plantations, LLC in the approximate amount of $21,815.48, including any and all accrued interest in the account **("Account 1")**;

b.    Any and all funds and holdings seized from Morris Bank, account ending in 4059, account in the name of Morning Star Ministries C/O Wilmer Shenk in the approximate amount of $477.04, including any and all accrued interest in the account **("Account 2")**;

c.    Any and all funds and holdings seized from Wells Fargo Bank[1], account ending in 3428, account in the name of Jason Shenk DBA BCB International, including any and all accrued interest in the account **("Account 3")**;

d.    Any and all funds and holdings seized from Wells Fargo Bank, account ending in 6317, account in the name of Shenk, Jason or Sharon, including any and all accrued interest in the account **("Account 4")**;

e.    Any and all funds and holdings seized from Wells Fargo Bank, account ending in 6846, account in the name of Shenk, Sharon or Jason, including any and all accrued interest in the account **("Account 5")**;

f.    Any and all funds and holdings seized from Wells Fargo Bank (United States), account ending in 6853, account in the name of Shenk, Ashlyn or Jason, including any and all accrued interest in the account **("Account 6")**;

---

[1] The total cumulative seized from **Accounts 3 through 7**, from Wells Fargo Bank was approximately $6,288.59.

g. Any and all funds and holdings seized from Wells Fargo Bank (United States), account ending in 8533, account in the name of Shenk, Jason DBA Jason Shenk Global Paradigm, including any and all accrued interest in the account **("Account 7")**;

h. The cash surrender value of Ameritas Life Insurance Policy ending in 855A, held by Jason Shenk, including any and all accrued interest in the policy **("Policy A")**;

i. The cash surrender value of Ameritas Life Insurance Policy ending in 865A, held by Sharon Shenk, including any and all accrued interest in the policy **("Policy B")**;

j. The cash surrender value of Ameritas Life Insurance Policy ending in 047A, held by Jason Shenk, including any and all accrued interest in the policy **("Policy C")**;

k. The cash surrender value of Ameritas Life Insurance Policy ending in 548A, held by Jason Shenk, including any and all accrued interest in the policy **("Policy D")**;

l. The cash surrender value of Ameritas Life Insurance Policy ending in 551A, held by Jason Shenk, including any and all accrued interest in the policy **("Policy E")**;

m. The cash surrender value of Ameritas Life Insurance Policy ending in 438A, held by Jason Shenk, including any and all accrued interest in the policy **("Policy F")**;

n. The cash surrender value of Ameritas Life Insurance Policy ending in 822A, held by Jason Shenk, including any and all accrued interest in the policy **("Policy G")**;

o. The cash surrender value of Ameritas Life Insurance Policy ending in 046A, held by David Shenk, including any and all accrued interest in the policy **("Policy H")**;

p. The cash surrender value of Ohio National Financial Services Policy ending in 8961, held by Sharon Shenk, including any and all accrued interest in the policy **("Policy I")**;

q. The cash surrender value of Ohio National Financial Services Policy ending in 8962, held by Sharon Shenk, including any and all accrued interest in the policy **("Policy J")**;

r. The cash surrender value of Ohio National Financial Services Policy ending in 8963, held by Sharon Shenk, including any and all accrued interest in the policy **("Policy K")**;

s. Items seized during the execution of a search warrant at 1956 Thundering Springs Road, East Dublin, GA 31027 on or about November 18, 2022, which were subsequently organized, inventoried, and input into the Asset Forfeiture Tracking and Retrieval System (AFTRAK) database **("Assets from the Safe")**, and specifically, the following items identified by AFTRAK number and description:

    i. 58230012-01 - $18,673, U.S. Currency

    ii. 58230013-01 - 5x, Engelhard .999 Fine Silver 100 Troy Ounce Bars

    iii. 58230014-01 - 20x, 2009 China Panda 10YN .999 Silver 1 Ounce Coins

    iv. 58230015-01 - 97x, 2010 China Panda 10YN .999 Silver 1 Ounce Coins

    v. 58230016-01 - 10x, 1881 $1 Coins

    vi. 58230016-02 - 1x, 1881S $1 Coin

    vii. 58230017-01 - 1x, 1882 $1 Coin

    viii. 58230017-02 - 1x, 1882S $1 Coin

    ix. 58230018-01 - 1x, 1883 $1 Coin

    x. 58230018-02 - 2x, 1883S $1 Coins

    xi. 58230019-01 - 1x, 1889 $1 Coin

    xii. 58230020-01 - 1x, 1897 $1 Coin

    xiii. 58230021-01 - 1x, 1880 $1 Coin

    xiv. 58230022-01 - 1x, 1896S $1 Coin

    xv. 58230023-01 - 1x, 1888-O $1 Coin

    xvi. 58230023-02 - 3x, 1888 OS $1 Coins

    xvii. 58230024-01 - 3x, 1884S $1 Coins

    xviii. 58230025-01 - 1x, 1921-DS $1 Coin

xix.   58230026-01 - 78x, 1 Troy Ounce .999 Silver Coins

xx.   58230027-01 - 100x, 1 Ounce Fine Silver - One Dollars

xxi.   58230028-01 - 100x, 1 Ounce Fine Silver - Five Dollars (Canadian Coin)

xxii.   58230029-01 - 1 Box / 6 Coins, China Olympics Commemorative Coin Set (Beijing 2008 Olympic Games Series Unknown Gold and Silver Set)

xxiii.   58230029-02 - 1 Box / 6 Coins, China Olympics Commemorative Coin Set (Beijing 2008 Olympic Games Series II Gold and Silver Set) & 1 Box / 6 Coins, China Olympics Commemorative Coin Set (Beijing 2008 Olympic Games Series III Gold and Silver Set)

xxiv.   58230038-01 - 1x, Five Troy Ounces .999 Fine Silver Bar - Pan American Silver Corp & 1x, Five Troy Ounces .999 Fine Silver Bar - Northwest Territorial Mint

xxv.   58230039-01 - 1x, One Troy Ounces .999 Fine Silver Bar - Pan American Silver Corp & 1x, One Troy Ounces .999 Fine Silver Bar - Northwest Territorial Mint

xxvi.   58230040-01 - 1x, One Ounce .999 Silver - Stagecoach Silver Bar & 2x, One Ounce .999 Silver - Stagecoach Silver Coins

xxvii.   58230041-01 - 4x, 2013 Liberty Coins - One Ounce Fine Silver - One Dollar

xxviii.   58230042-01 - 2x, Foreign Currency - 2013 Republiek Suriname - 10 Dollar Coins - One Ounce .999 AB

xxix.   58230043-01 - 1x (2012) & 2x (2011), Foreign Currency - Elizabeth II Five Dollar Coins - One Ounce Fine Silver

xxx.   58230044-01 - 5x, One Troy Ounce .999 Pure Silver - Compassion Relay Children's Foundation Coins

xxxi.   58230045-01 - 5x, One Troy Ounce .999 Pure Silver - Sunshine Orphaned Children World Foundation Coins

xxxii.   58230046-01 - Liberty Large Coin - 1x; Liberty Gold Coin - 1x; Liberty Silver Coin - 1x; Half Dollars - 3x; Quarter - 1x; Dime - 1x; Nickel - 1x; Pennies - 4x, U.S Coins

xxxiii.   58230047-01 - 1 Bag - 11 lbs., U.S. Currency - Various Loose & Rolled Coins

xxxiv.   58230048-01 - 1 Bag - 27 lbs., U.S. Currency - Various Loose Coins

xxxv.   58230049-01 - 1 Bag - 17 lbs., U.S. Currency - Dimes

xxxvi.   58230050-01 - 1 Bag - 22 lbs., U.S. Currency - Dimes

xxxvii.   58230051-01 - 1 Bag - 11 lbs., U.S. Currency - Dimes

xxxviii.   58230052-01 - 1 Bag - 3 lbs., Foreign Currency - Loose Coins from Various Countries & Paper Currency in envelope labeled "Belarus Money"

xxxix.   58230053-01 - 1 Bag - 1 Lb. (Quarters - 9x, Dimes - 14x, Nickels - 9x, Pennies - 29x,), U.S. Currency - Various Coins Individually Wrapped in White Paper; and

t.   8,500 "Series A Preferred" shares of Flibe Energy, Inc. owned by Autumnvale Group Ltd as of June 17, 2019 **("Defendant Shares")**.

4.   **Accounts 1 through 7** are collectively referred to as **Defendant Accounts.**

5.   **Policies A through K** are collectively referred to as **Defendant Policies.**

6.   **Defendant Accounts, Defendant Policies, Assets from the Safe,** and **Defendant Shares** are collectively referred to as **Defendant Property.**

7.   **Assets from the Safe** were seized on or about November 18, 2022, from Jason Shenk's former residence in East Dublin, Georgia as the result of a federal search warrant authorized and executed in the Southern District of Georgia.

8.   Federal seizure warrants were authorized for the **Defendant Property** in the Southern District of Georgia on or about February 9, 2023.

9.   Those seizure warrants were executed on the **Defendant Accounts**, **Defendant Policies**, and **Defendant Shares** on or about February 10, 2023, as described herein:

a.   **Defendant Policies** were seized pursuant to seizure warrants executed on property located in the District of Nebraska (Ameritas Life Insurance Policies – **Policies A through H**) and on property located in the Southern District

of Ohio (Ohio National Financial Services Policies – **Policies J and K**), via service on those institutions;

> b.      **Defendant Accounts** were seized pursuant to seizure warrants executed on property located in the Southern District of Georgia (**Accounts 1 and 2**) and Middle District of Georgia (**Accounts 3 through 7**), via service on the holding institutions; and

> c.      **Defendant Shares** were seized pursuant to a seizure warrant on property located in the Northern District of Alabama, via service to the holding institution.

10.      A seizure warrant was executed on **Assets from the Safe** on or about February 14, 2023.[2]

11.      The **Defendant Property** is currently in the possession of the Internal Revenue Service – Criminal Investigation ("IRS-CI") in the Northern District of Georgia, except for cash seized as part of **Assets from the Safe**, money seized from the **Defendant Accounts**, **Defendant Policies**, and **Defendant Shares**. The money seized from the **Defendant Accounts** and cash taken from the safe has been converted and is held in a government bank account in the Southern District of New York. The **Defendant Policies** are held by their respective organizations in the District of Nebraska and Southern District of Ohio. The **Defendant Shares** are held by their holding organization in the Northern District of Alabama.

---

[2]  **Assets from the Safe**, except for cash from the safe which has been deposited into a government held bank account, were already in the possession of Internal Revenue Service – Criminal Investigation (IRS-CI) in the Northern District of Georgia following a search warrant conducted at a residence at Thundering Springs Road, East Dublin, Georgia on or about November 18, 2022.

12.    Listed in this application are numerous other bank accounts for which forfeiture is not sought in this case but are referenced in this complaint.

13.    Accounts for which forfeiture is not sought through this case but which are relevant to the complaint (collectively referred to as "Non-Forfeiture Accounts" or "NF Accounts") are:

a.  Hang Seng Bank (Hong Kong), account ending in 0883, account in the name of CLF Asia Limited ("NF Account 1");

b.  Hang Seng Bank (Hong Kong), account ending in 2883, account in the name of Global Paradigm Limited ("NF Account 2");

c.  Hang Seng Bank (Hong Kong), account ending in 4883, account in the name of Connect Asia BV ("NF Account 3");

d.  UOB (Singapore), account ending in 2989, account ending in the name of Autumnvale Group Ltd. ("NF Account 4");

e.  Bank of America (United States), account ending in 0217, account in the name of Jason Shenk ("NF Account 5");

f.  Bank of America (United States), account ending in 7580, account in the name of Heartland Plantations, LLC ("NF Account 6");

g.  Morris Bank (United States), account ending in 2387, account in the name of Jason or Sharon Shenk ("NF Account 7");

h.  Morris Bank (United States), account ending in 9692, account in the name of Heartland Plantations, LLC ("NF Account 8");

i.  Wells Fargo Bank (United States), account ending in 9926, account in the name of Shenkland, LLC ("NF Account 9");

j.  Siam Commercial Bank (Thailand), account ending in 1118, account in the name of Jason Shenk ("NF Account 10");

k.  UOB (Singapore), account ending in 5256, account in the name of Autumnvale Group Ltd ("NF Account 11");

l.  UOB (Singapore), account ending in 8994, account in the name of Autumnvale Group Ltd ("NF Account 12");

m.  Standard Chartered Bank Limited (Hong Kong), account ending in 2471, account in the name of Jason Shenk ("NF Account 13");

n.  ABN Amro Bank (Singapore), account ending in 6457, account in the name of Connect Asia BV ("NF Account 14");

o.  Citibank (Singapore), account ending in 5083, account in the name of Jason Shenk ("NF Account 15");

p.  Citibank (Singapore), account ending in 5091, account in the name of Jason Shenk ("NF Account 16");

q.  Citibank (Singapore), account ending in 6366, account in the name of Jason Shenk ("NF Account 17");

r.  Citibank (Singapore), account ending in 8305, account in the name of Jason Shenk ("NF Account 18");

s.  DBS Bank (Singapore), account ending in 4533, account in the name of Connect Asia BV ("NF Account 19");

t.  DBS Bank (Singapore), account ending in 9022, account in the name of Connect Asia BV ("NF Account 20"); and

u.  Siam Commercial Bank (Thailand), account ending in 8351, account in the name of Jason Gerald Shenk ("NF Account 21").

14.  These Non-Forfeiture Accounts were used to conceal and transfer proceeds from Shenk's wire fraud scheme to other monetary instruments, assets, and financial accounts; to conceal the nature, location, source, ownership, and control of the funds; and to spend the proceeds and assets traceable to the proceeds through transactions exceeding $10,000.00.

## JURISDICTION AND VENUE

15.     The United States brings this action *In Rem* in its own right to forfeit the **Defendant Property.**

16.     This Court has jurisdiction over an action commenced by the United States pursuant to 28 U.S.C. § 1345.

17.     The Court has *In Rem* jurisdiction over the **Defendant Property** pursuant to 28 U.S.C. § 1355(a).

18.     Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and/or omissions giving rise to the forfeiture of the **Defendant Property** occurred in this district.

19.     Venue is also proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(B) and § 1395(b) because the **Defendant Accounts** and **Assets from The Safe** were found in this district.

20.     The alleged offenses, including both money laundering and wire fraud, occurred beginning at least in or about April 2010 through in or about July 2019, in the Southern District of Georgia and elsewhere.

21.     The discovery of these offenses occurred no earlier than on or about July 20, 2021.

## FACTS AND BASIS OF FORFEITURE

### Entities Overview

22. During the time period of the crimes alleged in this Verified Complaint, from at least in or about April 2010 through in or about July 2019, the following information contained in this section, titled "Entities Overview," was true and correct.

23. The IRS was an agency of the United States Department of the Treasury responsible for enforcing and administering the tax laws of the United States and collecting taxes owed to the United States.

24. IRS-CI was the federal law enforcement agency within the IRS responsible for investigating potential criminal violations of the U.S. Internal Revenue Code and related financial crimes.

25. Federal income tax refunds were funds paid from the Department of the Treasury.

26. A Christian charity identified herein as "Charity 1" was a Section 501(c)(3) charitable organization supporting Amish, Mennonite, and other conservative Anabaptist groups and individuals to minister to physical and spiritual needs around the world.

27. Charity 1 received charitable donations from individual donors to fund a variety of Christian ministry and outreach programs, including programs that provided food and clothing to needy families, addressed issues of material poverty

through loan programs, and restored homes and infrastructure impacted by natural disasters.

28.     Charity 1 raised money to fund a program dedicated to the production and distribution of Bibles and Christian literature in China.

29.     A Christian charity identified as "Charity 2" was an inter-denominational Christian ministry that received charitable donations from individual donors to fund a variety of ministry programs throughout the world, specifically including programs in China, Vietnam, Laos, Myanmar (Burma), Nepal, Bhutan, and northern India.

30.     Charity 2 raised money to fund a program dedicated to the production and distribution of Bibles and Christian literature in China.

### Summary

31.     This forfeiture action stems from the seizure of the **Defendant Property** which was involved in money laundering or traceable to such property, in violation of 18 U.S.C. §§ 1956 and 1957, and constitutes proceeds derived from and traceable to wire fraud, in violation of 18 U.S.C. § 1343, occurring between at least in or about April 2010, and continuing through at least in or about July 2019, in Laurens County, within the Southern District of Georgia, and elsewhere.

32.     On or about December 7, 2022, a thirty-seven count indictment was returned against Jason Shenk ("Shenk") alleging violations of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. §§ 1956(a)(2)(B)(i) (International Concealment Money Laundering), 1956(a)(1)(B)(i) (Concealment Money Laundering), and 1957 (Money

Laundering Involving Transactions Greater Than $10,000), which contain accompanying forfeiture provisions, as well as a violation of 31 U.S.C. § 5314 (Failure to File Report of Foreign Bank Account), in the Southern District of Georgia in Case No. 3:22-cr-19, which factual statements are incorporated by reference as if set forth fully herein.

33.     Between at least in or about 2013 and in or about 2019, Shenk did plan and execute a scheme whereby he obtained millions of dollars from Charity 1 and Charity 2 that Shenk promised would be used for the specific purpose of producing and distributing Bibles and other Christian literature in China.

34.     Shenk converted a significant amount of the charity money for his own personal use and benefit and for uses not allowed by the charities and donors which entrusted him with the money.

35.     Financial records, both foreign and domestic, as well as witness interviews, have revealed that these expenditures included but are not necessarily limited to the purchase of private equity shares in a nuclear energy company; the payment of money to an online sports gambling website that was subsequently shut down due to fraudulent activity; the purchase of life insurance policies in Shenk's own name and the name of multiple family members that was used as an investment vehicle; and the purchase of diamonds, gold, and other precious metals, as described herein.

36.     Shenk used a network of shell companies to conceal the ownership of the funds and then use the funds for his personal gain.

## Shenk False Representations to and
## Financial Transactions with Victim Charities

37.     Between in or about 2010 and in or about 2019, Shenk met with representatives from Charity 1 at least once a year but averaging two times per year.

38.     The representatives from Charity 1 would take notes during these meetings and these notes would then be compiled into one document which resembled meeting minutes.

39.     The minutes show Shenk consistently represented to Charity 1 the following regarding the charity money that they entrusted with him.

40.     Between in or about 2013 and in or about 2015, Shenk repeatedly told Charity 1 that the money entrusted to him would go from Charity 1 to his bank account in Georgia (**Account 2**), then to bank accounts in Hong Kong, and finally to be withdrawn as cash and then used to pay for the printing of Christian literature.

41.     Between in or about 2015 and in or about 2019, Shenk repeatedly told Charity 1 that the money would go from Charity 1 to **Account 2**, then to bank accounts in Singapore, and onward to bank accounts in China, where it was pulled out in cash from ATMs and used to pay for the printing of Christian literature inside of China.

42.     The meeting minutes maintained by Charity 1 as well as interviews with Charity 1 executive leadership indicate that Charity 1 continued to send money to Shenk based on his false representations that their money was used and would be used to produce and distribute Christian literature including Bibles.

43.     Shenk also provided false "distribution lists" that purported to show the number of Bibles produced and distributed (and by whom) for a specific geographical region or area.

44.     Further, the meeting minutes and financial records show several examples where Shenk represented to Charity 1 that the money they were sending to him would be used in one specific way, but once Shenk received the money it would be used in other ways.

45.     Shenk made similar misrepresentations regarding how their money would be used to both Charity 1 and Charity 2.

46.     Shenk's misrepresentations to Charity 2 were made orally from Shenk to Charity 2.

47.     Some examples include the following events.

48.     Representatives from Charity 1 met with Shenk on or about November 11, 2015, in Honolulu, Hawaii, and Shenk told Charity 1 that to get funds inside of China that "cards are used to withdraw cash inside the country."

49.     Representatives from Charity 1 met with Shenk on or about April 26, 2016, in Atlanta, Georgia.

50.     Meeting minutes prepared and maintained by Charity 1 show that starting in or about May 2016, Charity 1 would send Shenk approximately $225,000 monthly which Shenk said would be used to create 150,000 Bibles per month.

51.     After this meeting, on or about May 5, 2016, Charity 1 transferred approximately $315,000 to **Account 2**.

52.     On or about May 25, 2016, **Account 2** wired approximately $150,150 to NF Account 20.

53.     On or about May 27, 2016, NF Account 20 issued a check ending in 0177 for approximately $150,000 which was deposited into NF Account 15.

54.     The May 2016 transactions are an example of a diversion of money from what Shenk told Charity 1.

55.     On or about June 1, 2016, Charity 1 wired approximately $345,000 to **Account 2**.

56.     On or about June 13, 2016, Charity 2 wired approximately $150,000 to **Account 2**.

57.     On or about June 16, 2016, **Account 2** wired approximately $495,000 to NF Account 20.

58.     On or about June 28, 2016, NF Account 20 issued a check ending in 0179 for approximately $120,000 which was deposited into NF Account 15.

59.     On or about June 28, 2016, NF Account 20 issued a check ending in 0180 for approximately $110,000 which was deposited into NF Account 4.

60.     On or about July 5, 2016, NF Account 4 wired approximately $100,000 to Crown Financial Services Trust which according to publicly available information was a business based in New Zealand offering "innovative financial solutions" including "wealth management, corporate services, commercial lending, multi-currency institutional accounts, and purchasing/managing/storing and leveraging gold and other precious metals."

61.    The June and July 2016 transactions are examples of the diversion of money from what Shenk represented would occur regarding the use of the charities' money.

62.    Representatives from Charity 1 met with Shenk on or about November 30, 2016, in Denver, Colorado.

63.    Meeting minutes prepared and maintained by Charity 1 show that Shenk stated all the funds from Charity 1 were being withdrawn via ATMs inside China.

64.    At some point during or after the meeting, Shenk also provided a "Distribution List" for 2016 showing Bible funding from Charity 1 was approximately $1,800,000 and with that money he produced approximately 1,177,600 Bibles.

65.    Between on or about April 26, 2016, and on or about March 29, 2017, Charity 1 sent approximately $3,434,400 to **Account 2**, with approximately $3,430,000 specifically to produce Christian literature (including Bibles).

66.    Representatives from Charity 1 met with Shenk on or about March 29, 2017, in the Atlanta Airport in Atlanta, Georgia.

67.    Meeting minutes prepared and maintained by Charity 1 show that Shenk again stated that all "funds are withdrawn via ATM."

68.    Shenk also stated that "China is still largely a cash-based society" as a justification for why withdrawing all of the funds via ATM was feasible.

69.    On or about August 1, 2017, Charity 1 wired approximately $220,000 to **Account 2**.

70.    On or about August 23, 2017, Charity 2 wired approximately $84,400 to **Account 2**.

71.    On or about August 24, 2017, **Account 2** wired approximately $304,800 to <u>NF Account 20</u>.

72.    On or about September 6, 2017, <u>NF Account 20</u> issued a check ending in 0188 for approximately $140,000 which was deposited into <u>NF Account 15</u>.

73.    On or about September 11, 2017, <u>NF Account 20</u> wired approximately $140,000 to <u>NF Account 4</u>.

74.    On or about February 5, 2018, <u>NF Account 4</u> wired approximately $50,000 to a bank account in the name of Flibe Energy to begin purchasing the **Target Shares**.

75.    These transactions are an example of a diversion of money from what Shenk said would occur with the charities' money.

76.    Representatives from Charity 1 met with Shenk on or about November 9, 2017, in Frankfurt, Germany.

77.    Meeting minutes prepared and maintained by Charity 1 show Shenk stated that "the funds have all been sent for Bibles & Bible story books" and that he was producing 170,000 Bibles per month.

78.    Charity 1 concluded their notes with "continue with Bible funds in 2018 at same level as 2017."

79.     Between on or about March 29, 2017, and on or about November 9, 2017, Charity 1 sent approximately $1,868,200 to **Account 2** with approximately $1,865,000 sent specifically to produce Christian literature (including Bibles).

80.     Representatives from Charity 1 met with Shenk on or about November 8, 2018, in San Diego, California.

81.     Meeting minutes prepared and maintained by Charity 1 show that Shenk stated again that "funds are sent from the Georgia bank to Singapore" and "withdrawals are then made via ATM transactions."

## Financial Overview and Shenk Statements

82.     Morning Star Ministries ("MSM") is an organization listed as the owner of a business checking account held at Morris Bank in Dublin, Georgia (**Account 2**).

83.     During the time period from at least in or about April 2010 through in or about July 2019, MSM was neither registered as a legal entity with the Georgia Secretary of State, nor registered as a tax-exempt entity with the Internal Revenue Service.

84.     Shenk is one of three signers on **Account 2**, along with two of his relatives.

85.     Between on or about January 1, 2013, and on or about December 31, 2019, Shenk received approximately $26.43 million from Charity 1 and Charity 2 into **Account 2**.

86.     These credits represent approximately 97% of all credits into **Account 2**, during that time period.

87.     Between on or about August 5, 2015, and on or about December 12, 2018, NF Account 20 received approximately $14,540,197.00 from **Account 2**.  The amount received from **Account 2** is approximately 94% of all credits into NF Account 20**.**

88.     Between on or about July 1, 2015, and on or about July 9, 2015, NF Account 19 was sent approximately $1,005,950.00 from **Account 2**.

89.     Between on or about April 16, 2013, and on or about June 29, 2105, NF Account 1 was sent approximately $8,407,553.64 from **Account 2**.

90.     Between on or about April 1, 2010, and on or about November 3, 2014, NF Account 1 received approximately $9,362,965.00 from a bank account in the name of Charity 2.

91.     Once Shenk transferred the charity money from the United States (**Account 2**) to Hong Kong (NF Account 1) and Singapore (NF Account 19 and NF Account 20), the charity money was often spent on purchases and expenditures that were never authorized by Charity 1 or Charity 2.

92.     In an interview with IRS-CI on or about April 2, 2019, Shenk admitted to setting up what he referred to as "shell" companies as a way to allegedly move money into China for the purpose of producing Christian literature inside of China.

93.     Two of the "shell" companies that he owned, controlled, and operated are Connect Asia BV ("CAB") and CLF Asia Limited ("CAL").

94.     DBS Bank (Singapore) records list that CAB was incorporated in Samoa.

95.     During an interview with IRS-CI on or about April 8, 2019, Shenk stated CAL was a company he registered in the British Virgin Islands and CAB was registered in the Samoan Islands.

96.     Between on or about January 1, 2013, and on or about December 31, 2019, bank accounts in the names of CAL and CAB received approximately $26,931,425.64 from the **Account 2**.

97.     These transfers to CAL and CAB account for approximately 99% of all debits out or from **Account 2** between on or about January 1, 2013, and on or about December 31, 2019.

98.     Shenk further admitted in his interviews on April 2, 2019, and April 8, 2019, that he used a variety of shell companies and other entities to conceal the transfers, including:

a.     BCB International, a company that Shenk stated was never operational;

b.     Shenkland LLC, a company that Shenk said he used for unidentified "investors";

c.     Global Paradigm Limited ("GPL"), a shell company that Shenk said unidentified people in Asia used to invest in early-stage startup companies;

d.     Heartland Plantations, an entity operated by Shenk's family;

e.     Autumnvale Group Limited, another Shenk shell company, and;

f.     Unity of One Inc., an international private investigation, security, and due diligence firm that Shenk claims to have worked for at one point.

99.     During his interviews, Shenk did not identify any other significant source of income that could account for the large sums of cash moving from one shell company account to the next.

100.    Based on his control of the NF Accounts and **Defendant Accounts**, Shenk either directly or indirectly caused all wire and other transfers of money into and out of these accounts.

## Precious Metals and Diamonds

101.    Between on or about June 28, 2016, and on or about December 13, 2018, Shenk transferred or caused to be transferred (either via check or wire) approximately $2,586,204.87 from NF Account 20 to NF Account 4, including the following transactions.

102.    On or about June 10, 2019, Shenk sent a wire of approximately $23,540.98 from NF Account 4 to an entity named Silver Bullion Pte Ltd.

103.    Publicly available information indicates Silver Bullion Pte Ltd was a company in Singapore that advertises that they buy, sell, and store gold and silver.

104.    Between on or about March 8, 2018 and on or about June 4, 2019, Shenk sent approximately 12 wires totaling approximately $142,410.98 from NF Account 4 to an entity named C.K. Futures.

105.    Publicly available information indicates C.K. Futures provided and provides support activities for the mining industry.

106.    On or about July 5, 2016, Shenk sent a wire of approximately $100,000.00 from NF Account 4 to an entity named Crown Financial Services Trust.

107.   As noted above, publicly available information indicates that Crown Financial Services is a company based in New Zealand that offers wealth management services as well as "purchasing, managing, storing, and leveraging gold and other precious metals" for their clients.

108.   Records received from ABN AMRO Bank in Singapore show that on at least on or about January 10, 2017, Shenk affirmed to ABN ARMO Bank that he was the "Asia Director for UOI Gold and Diamonds DMCC" and stated that the "Business is into Providing gold and diamond processing via the free trade zone in Dubai."

109.   In the same document, he further asserted that he had $1.9 million in "cash and gold and silver" at Hang Seng Bank in Hong Kong.

110.   Between on or about April 10, 2013, and on or about July 2, 2015, NF Account 9 received approximately $616,865.63 from NF Account 3, approximately $79,977.00 from NF Account 2, approximately $31,764.79 from NF Account 1, and approximately $13,000.00 from NF Account 5.

111.   NF Account 1 is one of the bank accounts which received charity funds from **Account 2**.

112.   These transfers into NF Account 9 account for approximately 86% of all monies going into that bank account.

113.   On or about April 10, 2013, Shenk sent a wire of approximately $50,400 from NF Account 9 to an entity named Guildhall Wealth Management, Inc.

114.     Publicly available information indicates Guildhall Wealth Management was a company in Canada that advertises that they buy and sell gold, silver, diamonds, and other precious metals and gems.

115.     Between on or about July 19, 2013, and on or about May 4, 2015, Shenk sent approximately nine checks or wires totaling approximately $741,520.00 (approximately $350,000.00 from <u>NF Account 6</u>, approximately $326,020.00 from **Account 1**, approximately $60,000.00 from <u>NF Account 9</u>, and approximately $5,500.00 from <u>NF Account 5</u>) to an entity named Unity of One, Inc. (aka UOI aka UOI Gold and Diamonds DMCC).

116.     Publicly available information indicates that Unity of One, Inc. (aka UOI aka UOI Gold and Diamonds DMCC) was a private security firm that provides gold and diamond processing via the free trade zone in Dubai among other services.

## International Travel and Business

117.     Government records show that Shenk was inside the United States for at least 467 days between on or about April 7, 2013, and on or about May 22, 2019.

118.     The location he arrived at and departed from the U.S. most often was Hartfield Jackson International Airport in Atlanta, Georgia, with seven arrivals and seven departures from that airport.

119.     Shenk averaged three trips into and out of the United States per year between in or about 2013 and in or about 2019.

120.     According to a document dated August 2, 2013, from ABN AMRO Bank (Singapore), Shenk made several assertions about his business, as detailed below.

121.   First, Shenk stated his primary business was "developing land for the citizenship by investment program in St. Kitts under a company called 407 Harbourside Company Limited which was established in May 2001."

122.   Second, Shenk also stated he had a company called "Carlmas Holdings Limited which is a land development company" that he started in 2012 which builds teak houses in Sumatra, Indonesia.

123.   Third, the document further stated that Shenk's "father… worked for the oil wells in the USA" and that "his father sold the family farm in Canada…in 1990 where [Jason Shenk] was brought up and purchased another farm in Uruguay."

124.   According to witness testimony, Jason Shenk's father moved to Georgia in the 1970s and did not own a farm in Canada or Uruguay.

125.   Also, according to witness testimony, Jason Shenk was born, raised, and went to primary school in the United States.

126.   Lastly, the August 2, 2013 document stated Jason Shenk's business "generates … USD 1.5 million per year from his development company in St. Kitts."

127.   According to a document dated January 10, 2017, from ABN AMRO Bank (Singapore), Shenk made several assertions about his business, as detailed below.

128.   First, Shenk stated he was conducting business in Indonesia, St. Kitts & Nevis, Thailand, and Uruguay.

129.   Second, Shenk stated he was the "Asia Director for UOI Gold and Diamonds DMCC" from July 2012 through January 2017 where he earned approximately $390,000 per year in income.

130.   Records received from the state of Georgia show Shenk received foreign compensation of $92,084 during the 2015 tax year.

131.   Documents received from UOB (Singapore) show that Autumnvale Group Limited was registered in the Marshall Islands with a company operating address in Singapore.

132.   Documents received from DBS Bank (Singapore) show, among other documents, a copy of a driver's license issued by the Kingdom of Thailand in the name of Mr. Jason Gerald Shenk.

133.   Further information received in the case shows Shenk's physical connection to a number of foreign countries.

134.   Investigators received additional information in this case indicating that Shenk is currently outside the United States and is avoiding apprehension and prosecution.

### The Safe at Thundering Springs Road

135.   On or about October 26, 2022, investigators received information regarding a gun safe in the basement of Shenk's former residence on Thundering Springs Road in Dublin, Georgia, within the Southern District of Georgia, that contained multiple items belonging to Shenk.

136.    As a result of the information gathered, a federal search warrant was obtained and executed on the former residence.

137.    While executing a search warrant on Shenk's former residence on Thundering Springs Road in East Dublin, Georgia, on or about November 18, 2022, IRS-CI seized the **Assets from the Safe**.

138.    Based on Shenk's financial affairs, sources of income including a lack of legitimate lawful income, and other information in this case, it is believed that the **Assets from the Safe** constitute property that was involved in concealment money laundering and are the proceeds of or traceable to the proceeds of wire fraud.

## Wire Fraud and Money Laundering Through Defendant Property and Other Financial Accounts

139.    Shenk used a complicated web of entities and bank accounts in multiple countries to facilitate the unlawful conversion and laundering of the funds from the charities.

140.    The following information describes some of the relevant movement of funds through and to the **Defendant Accounts**, **Defendant Policies**, and **Defendant Shares**, as well as to and through additional financial accounts.

141.    The money seized from the **Defendant Accounts** and the **Defendant Policies** and **Defendant Shares** constitute property involved in money laundering, both domestic and international, and are the proceeds of or traceable to the proceeds of wire fraud.

142.    Particularly, Shenk used **Account 2** to defraud charities, including Charity 1 and Charity 2, of money that was to be used to print Bibles and advance

Christianity, when as he then and there knew, that money would not and did not in fact go to that purpose.

143. Rather, Shenk used the millions of dollars that he defrauded the charities of in order to enrich himself.

144. After receiving millions of dollars into **Account 2**, Shenk then used financial transactions and accounts to launder the money to conceal and disguise the nature, location, source, ownership, and control of the proceeds of his wire fraud scheme.

145. Shenk also spent the proceeds of his wire fraud scheme through monetary transactions exceeding $10,000 per transaction.

146. Based on financial records obtained during the investigation, **Account 2** was opened before on or about December 4, 2012, at Morris Bank in Dublin, Georgia, and Shenk was added on as a signer on **Account 2** as of on or about May 22, 2013.

147. From at least on or about May 22, 2013, the address listed for **Account 2** was listed as an address in East Dublin, Georgia.

148. Dublin and East Dublin, Georgia are both located within the Southern District of Georgia.

149. All of the approximately $26.43 million received from Charity 1 and Charity 2 into **Account 2** culminated in the Southern District of Georgia.

150.    All the approximately $26.93 million sent from **Account 2** to CAB and CAL, which were at the time Shenk controlled organizations, originated in the Southern District of Georgia but culminated in foreign jurisdictions.

151.    Wires from **Account 2** culminated in both Singapore and Hong Kong.

152.    From Singapore and Hong Kong, those funds were transferred to other accounts in Singapore and Hong Kong as well as to accounts in Australia, New Zealand, Chile, Canada, Panama, Hungary, Thailand, St. Kitts and Nevis, and back to the United States.

153.    During the period over which Shenk received funds from Charity 1 and Charity 2, **Defendant Accounts 1 through 4** were involved in monetary transactions involving more than $10,000, which constituted or was derived from proceeds traceable to violations of 18 U.S.C. §1343, including the following monetary transactions.

154.    **Account 1** transferred over $10,000 on approximately 66 occasions to other Shenk controlled bank accounts, other entities/companies which appear to have been engaged in the business of selling assets, or to purchase an asset directly.

155.    **Account 2** transferred over $10,000 on approximately 75 occasions to other Shenk controlled bank accounts, other entities/companies which appear to have been engaged in the business of selling assets, or to purchase an asset directly.

156.    **Account 3** transferred over $10,000 on approximately 81 occasions to other Shenk controlled bank accounts, other entities/companies which appear to have been engaged in the business of selling assets, or to purchase an asset directly.

157.   **Account 4** transferred over $10,000 on approximately three occasions to other Shenk controlled bank accounts, other entities/companies which appear to have been engaged in the business of selling assets, or to purchase an asset directly.

158.   As noted, Shenk conducted numerous financial transactions that were designed, in whole or in part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds of his wire fraud scheme.

159.   Shenk conducted this concealment and disguise through numerous methods which include, but are not necessarily limited to, the use of shell companies as the owner of an account, the use of multiple bank accounts in different countries, the use of false and fraudulent statements to banks regarding the nature of Shenk's income, and high velocity transfers of money from one account to another and one country to another.

160.   In addition, Shenk stated in his interview that the purpose of the shell companies he operated and controlled was to conceal the nature, source, and ownership of the funds.

161.   Shenk had signature authority over all the **Defendant Accounts** as well as all of the <u>Non-Forfeiture Accounts</u>.

162.   As a signer on the accounts, he had the authority to review statements, make deposits, make withdrawals, and move funds.

163.   All funds received from Charity 1 and Charity 2 alleged herein, including all funds from the charities received by means of false or fraudulent pretenses, representations, and promises were received via wire to **Account 2**, a

bank account maintained at Morris Bank, headquartered in Dublin, Georgia, in the Southern District of Georgia.

164.    Shenk caused these funds to be transferred to **Account 2** based on the false or fraudulent pretenses, representations, or promises he made to both Charity 1 and Charity 2 regarding the ultimate use of the funds, which as Shenk then and there well knew were false and fraudulent.

165.    All funds sent from **Account 2** to bank accounts in Singapore and Hong Kong originated from a bank account maintained at Morris Bank, headquartered in Dublin, Georgia.

166.    All the laundered funds alleged in this complaint came from **Account 2**.  Shenk caused these funds to be sent internationally by either transferring them himself or by directing a family member and co-signer on the bank account to send funds overseas.

167.    Between on or about December 4, 2012, and on or about May 12, 2021, **Account 2** received approximately $26,430,829.00 from Charity 1 and Charity 2.

168.    During that same period, **Account 2** sent the following funds to the following accounts:

        a.    Approximately $17,517,922 to <u>NF Account 20</u>;

        b.    Approximately $1,005,950.00 to <u>NF Account 19</u>; and

        c.    Approximately $8,407,553.64 to <u>NF Account 1</u>.

169.    Between on or about August 5, 2015, and on or about December 13, 2018, <u>NF Account 20</u> sent the following funds to the following accounts:

    a.      Approximately $2,586,317.28 to <u>NF Account 4;</u>

    b.      Approximately $1,164,000.00 to <u>NF Account 15</u>;

    c.      Approximately $650,000.00 to <u>NF Account 14</u>;

    d.      Approximately $280,000.00 to **Account 3**;

    e.      Approximately $273,095.10 to <u>NF Account 19</u>; and

    f.      Approximately $10,315,960.43 to accounts unknown to the investigation.

170.    Between on or about November 1, 2014, and on or about December 31, 2018, <u>NF Account 19</u> sent the following funds to the following accounts:

    a.      Approximately 400,000.00 SGD to <u>NF Account 14</u>;

    b.      Approximately 84,000.00 SGD to <u>NF Account 16</u>;

    c.      Approximately 78,361.00 SGD to <u>NF Account 20</u>; and

    d.      Approximately 1,669,397.72 SGD to accounts unknown to the investigation.

171.    Between on or about February 14, 2014, and on or about May 12, 2015, the following funds were sent by <u>NF Account 1</u>:

    a.      Approximately $870,518.35 to <u>NF Account 6;</u> and

    b.      Approximately $31,764.79 to <u>NF Account 9</u>.

172.    Between on or about August 12, 2015, and on or about November 30, 2018, <u>NF Account 15</u> sent the following funds to the following accounts:

    a.      Approximately $274,357.354 to two Citibank (Singapore), accounts in the name of Jason Shenk (<u>NF Account 16</u> and <u>NF Account 18</u>);

b.      Approximately $367,798.27 to two Siam Commercial Bank PCL (Thailand), accounts in the of Jason Shenk (<u>NF Account 21</u> and <u>NF Account 10</u>); and

c.      Approximately $100,000.00 to **Account 3**.

173.    Between on or about January 1, 2013, and on or about December 10, 2019, <u>NF Account 4</u> sent the following funds to the following accounts:

a.      Approximately $1,159,500.00 to **Account 3**;

b.      Approximately $850,000.00 to a Wells Fargo Bank (United States) account ending in 2476, account in the name of Flibe Energy, Inc.;

c.      Approximately $260,000.00 to three separate accounts in the name of Jason Gerald Shenk:

    i.      Approximately $150,000.00 to <u>NF Account 15</u>**;**

    ii.     Approximately $60,000.00 to a bank account in the name of Jason Shenk, unknown bank and bank account; and

    iii.    Approximately $50,000.00 to <u>NF Account 13</u>.

d.      Approximately $221,417.96 to two separate UOB (Singapore) bank accounts in the of Autumnvale Group Limited (<u>NF Account 11</u> and <u>NF Account 12</u>);

e.      Approximately $142,410.98 to two separate bank accounts in the name of C.K. Futures:

    i.      Approximately $103,151.26 to a Bridgewater Bank (United States), account ending in 1301, account in the name of C.K. Futures; and

    ii.     Approximately $39,259.72 to an unknown bank and unknown bank account number in the name of C.K. Futures.

174.    Between on or about January 16, 2015, and on or about September 5, 2018, <u>NF Account 16</u> sent the following funds to the following accounts:

a.      Approximately 55,064.55 SGD to two separate Citibank (Singapore) bank accounts all in the name of Jason Shenk (NF Account 15 and NF Account 17); and

b.      Approximately 25,000.00 SGD to NF Account 19.

175.    Between on or about September 29, 2017, and on or about December 31, 2018, NF Account 18 sent the following funds to the following accounts:

a.      Approximately $57,606.22 to two separate Citibank (Singapore) bank accounts, both in the name of Jason Shenk (NF Account 15 and NF Account 17); and

b.      Approximately $6,236.77 to NF Account 21.

176.    Between on or about August 12, 2015, and on or about November 30, 2018, NF Account 15 sent the following funds to the following accounts:

a.      Approximately $274,357.54 to two separate Citibank (Singapore) bank accounts, both in the name of Jason Shenk (NF Account 16 and NF Account 18);

b.      Approximately $367,798.27 to two separate Siam Commercial Bank (Thailand) bank accounts both in the name of Jason Shenk (NF Account 21 and NF Account 10);

c.      Approximately $100,000.00 to **Account 3**; and

d.      Approximately $70,000.00 to **Account 4.**

177.    Between on or about June 24, 2015, and on or about February 25, 2019, **Account 3** sent the following funds to the following accounts:

a.      Approximately $1,582,063.48 to **Account 1**;

b.      Approximately $27,210.00 to **Account 7**;

c.      Approximately $8,000.00 to **Account 6**; and

d.      Approximately $8,000.00 to **Account 5**.

- 34 -

178.   Between January 15, 2013, and July 14, 2015, NF Account 6 received approximately $2,431,864.15 from NF Account 3, approximately $870,518.35 from NF Account 1, approximately $175,607.65 from NF Account 2, approximately 80,431.99 from NF Account 5, and approximately $30,000 from **Account 1**.

179.   These transfers into NF Account 6 account for approximately 96% of all monies going into that bank account.  Between the same time frame, NF Account 6 sent out the following funds to the following accounts:

a.   Approximately $1,015,000.00 to **Account 1**;

b.   Approximately $442,087.47 to NF Account 8; and

c.   Approximately $350,171.00 to NF Account 5.

180.   During the investigation, numerous insurance policies were owned and/or paid on by Shenk using wire fraud proceeds, funds traceable to those proceeds, and laundered funds.

181.   Particularly, Shenk used wire fraud proceeds, funds traceable to those proceeds, and property involved in money laundering to purchase the **Defendant Policies**.

182.   At times, Shenk would make payments toward a life insurance policy and then would request a loan against the value of that policy.

183.   Some of the insurance loan funds were used by Shenk's relatives in their duties in operating Heartland Plantations, LLC.

184.    Additionally, Shenk used wire fraud proceeds, funds traceable to those proceeds, and property involved in money laundering to purchase the **Defendant Shares**.

185.    All the transactions appeared to be layered and structured to place illegitimate money into banking systems around the world including in the United States.

### Summary of Bases for Forfeiture of Defendant Property

186.    Brief summaries for each **Defendant Property**, showing the relationship to the wire fraud proceeds and money involved in money laundering are listed below.

187.    **Account 1**.  The account was opened and/or maintained during the time that the two charities were sending Shenk funds and received approximately $1,632,063.48 from **Account 3**, and the account received approximately $1,075,000.00 from NF Account 6, and is forfeitable under both forfeiture bases (money laundering and wire fraud proceeds).

188.    **Account 2**.  The account was opened and/or maintained during the time that the two charities were sending Shenk funds and received approximately $22,283,350.00 from a bank account controlled by Charity 1, received approximately $4,147,479.00 from bank accounts controlled by Charity 2, sent approximately $18,523,872.00 to bank accounts in the name of CAB (approximately $17,517,922.00 to NF Account 20 and approximately $1,005,950.00 to NF Account 19), and sent

approximately $8,407,553.64 to <u>NF Account 1</u>, and is forfeitable under both forfeiture bases (money laundering and wire fraud proceeds).

189.    **Account 3**.  The account was opened and/or maintained during the time of the alleged fraud scheme and when the two charities were sending Shenk funds and received approximately $3,086,272.19 from <u>NF Account 2</u>, received approximately $1,119,300.00 from <u>NF Account 4</u>, received approximately $279,950.00 from <u>NF Account 20</u>, and sent approximately $1,582,063.48 to **Account 1**, and is forfeitable under both forfeiture bases (money laundering and wire fraud proceeds).

190.    **Account 4**.  The account was opened and/or maintained during the time that the two charities were sending Shenk funds and received approximately $69,985.00 from <u>NF Account 15</u>, and received approximately $9,985.00 from <u>NF Account 16</u>, and is forfeitable under both forfeiture bases (money laundering and wire fraud proceeds).

191.    **Account 5**.  The account was opened and/or maintained during the time that the two charities were sending Shenk funds and received approximately $4,000.00 from **Account 3**, and is forfeitable under both forfeiture bases (money laundering and wire fraud proceeds).

192.    **Account 6**.  The account was opened and/or maintained during the time that the two charities were sending Shenk funds and the account received approximately $8,000.00 from **Account 3**, and is forfeitable under both forfeiture bases (money laundering and wire fraud proceeds).

193. **Account 7**. The account was opened and/or maintained during the time that the two charities were sending Shenk funds and received approximately $27,210.00 from **Account 3**, and is forfeitable under both forfeiture bases (money laundering and wire fraud proceeds).

194. **Policy A**. Four bank accounts paid toward this policy including **Account 1**, **Account 3**, NF Account 6, and NF Account 8. Each of these bank accounts received wire fraud proceeds and/or laundered funds at some point prior to or shortly after making a payment toward this insurance policy. Policy loans taken out against the cash value of this policy were received by two bank accounts including **Account 1** and **Account 3** in a sum of approximately $599,483.00. The premiums were paid by Shenk. **Policy A** is forfeitable under both forfeiture bases (money laundering and wire fraud proceeds).

195. **Policy B**. Bank account records show a total of approximately $358,582.60 was paid toward this policy between in or about 2013 and in or about 2018. Four bank accounts paid toward this policy including **Account 1**, **Account 3**, NF Account 6, and NF Account 8. Each of these bank accounts received wire fraud proceeds and/or laundered funds at some point prior to or shortly after making a payment toward this insurance policy. Policy loans taken out against the cash value of this policy were received by one bank account (**Account 1**) and totaled $324,882.00. The premiums were paid by Shenk. **Policy B** is forfeitable under both forfeiture bases (money laundering and wire fraud proceeds).

196.  **Policy C**.  Bank account records show a total of approximately $206,993.20 was paid toward this policy between in or about 2013 and in or about 2018.  Four bank accounts paid toward this policy including **Account 1**, **Account 3**, NF Account 6, and NF Account 8.  Each of these bank accounts received wire fraud proceeds and/or laundered funds at some point prior to or shortly after making a payment toward this insurance policy.  Policy loans taken out against the cash value of this policy were received by two bank accounts including **Account 1** and **Account 3** in a sum of approximately $183,401.00.  The premiums were paid by Shenk.  **Policy C** is forfeitable under both forfeiture bases (money laundering and wire fraud proceeds).

197.  **Policy D**.  Bank account records show a total of approximately $114,892.21 was paid toward this policy between in or about 2012 and in or about 2019.  Four bank accounts paid toward this policy including **Account 1**, **Account 3**, NF Account 7, and NF Account 8.  Each of these bank accounts received wire fraud proceeds and/or laundered funds at some point prior to or shortly after making a payment toward this insurance policy.  Policy loans taken out against the cash value of this policy were received by three bank accounts including **Account 1**, NF Account 5, and NF Account 8 in a sum of approximately $101,867.00.  The premiums were paid by Shenk.  **Policy D** is forfeitable under both forfeiture bases (money laundering and wire fraud proceeds).

198.  **Policy E**.  Bank account records show a total of approximately $260,012.79 was paid toward this policy between in or about 2012 and in or about

2019.  Three bank accounts paid toward this policy including **Account 1**, **Account 3,** and <u>NF Account 7</u>.  Each of these bank accounts received wire fraud proceeds and/or laundered funds at some point prior to or shortly after making a payment toward this insurance policy.  Policy loans taken out against the cash value of this policy were received by three bank accounts including **Account 3**, <u>NF Account 5</u>, and <u>NF Account 8</u> in a sum of approximately $84,007.83.  The premiums were paid by Shenk.  **Policy E** is forfeitable under both forfeiture bases (money laundering and wire fraud proceeds).

199.  **Policy F**.  Bank account records show a total of approximately $526,104.22 was paid toward this policy between in or about 2014 and in or about 2018.  Two bank accounts paid toward this policy including **Account 1** and **Account 3**.  Each of these bank accounts received wire fraud proceeds and/or laundered funds at some point prior to or shortly after making a payment toward this insurance policy.  Policy loans taken out against the cash value of this policy were received by one bank account (**Account 3**) and totaled approximately $458,994.00.  The premiums were paid by Shenk.  **Policy F** is forfeitable under both forfeiture bases (money laundering and wire fraud proceeds).

200.  **Policy G**.  Bank account records show a total of approximately $824,991.84 was paid toward this policy between in or about 2016 and in or about 2019.  Two bank accounts paid toward this policy including **Account 1** and **Account 3**.  Each of these bank accounts received wire fraud proceeds and/or laundered funds at some point prior to or shortly after making a payment toward this insurance policy.

Policy loans taken out against the cash value of this policy were received by one bank account (**Account 1**) and totaled approximately $650,337.00. The premiums were paid by Shenk. **Policy G** is forfeitable under both forfeiture bases (money laundering and wire fraud proceeds).

201. **Policy H**. Bank account records show a total of approximately $260,012.79 was paid toward this policy between in or about 2013 and in or about 2018. Four bank accounts paid toward this policy including **Account 1**, **Account 3**, NF Account 6, and NF Account 8. Each of these bank accounts received wire fraud proceeds and/or laundered funds at some point prior to or shortly after making a payment toward this insurance policy. Policy loans taken out against the cash value of this policy were received by one bank account (**Account 1**) and totaled approximately $275,254.00. The premiums were paid by Shenk. **Policy H** is forfeitable under both forfeiture bases (money laundering and wire fraud proceeds).

202. **Policy I**. Bank account records show a total of approximately $82,840.38 was paid toward this policy between in or about 2014 and in or about 2019. Three bank accounts paid toward this policy including **Account 1**, **Account 3**, and NF Account 8. Each of these bank accounts received wire fraud proceeds and/or laundered funds at some point prior to or shortly after making a payment toward this insurance policy. Policy loans taken out against the cash value of this policy were received by one bank account (**Account 1**) and totaled approximately $26,495.63. The premiums were paid by Shenk. **Policy I** is forfeitable under both forfeiture bases (money laundering and wire fraud proceeds).

203. **Policy J**.   Bank account records show a total of approximately $115,089.56 was paid toward this policy between in or about 2014 and in or about 2019.   Three bank accounts paid toward this policy including **Account 1**, **Account 3**, and <u>NF Account 8</u>.   Each of these bank accounts received wire fraud proceeds and/or laundered funds at some point prior to or shortly after making a payment toward this insurance policy.   Policy loans taken out against the cash value of this policy were received by one bank account (**Account 1**) and totaled approximately $39,441.15.   The premiums were paid by Shenk.   **Policy J** is forfeitable under both forfeiture bases (money laundering and wire fraud proceeds).

204. **Policy K**.   Bank account records show a total of approximately $101,990.01 was paid toward this policy between in or about 2014 and in or about 2019.   Three bank accounts paid toward this policy including **Account 1**, **Account 3**, and <u>NF Account 8</u>.   Each of these bank accounts received wire fraud proceeds and/or laundered funds at some point prior to or shortly after making a payment toward this insurance policy.   Policy loans taken out against the cash value of this policy were received by one bank account (**Account 1**) and totaled $33,538.20.   The premiums were paid by Shenk.   **Policy K** is forfeitable under both forfeiture bases (money laundering and wire fraud proceeds).

205. **Defendant Shares**.   Flibe Energy, Inc. records show these shares were purchased using funds from <u>NF Account 4</u>.   Prior to sending the funds to purchase these shares, <u>NF Account 4</u> received approximately $2,586,204.87 from <u>NF Account 20</u>.   <u>NF Account 20</u> received approximately $17,517,922 from **Account 2**, which

received funds directly from both charities.  **Defendant Shares** are forfeitable under both forfeiture bases (money laundering and wire fraud proceeds).

206.   **Assets from the Safe**.  The **Assets from the Safe** are consistent with transactions observed in bank accounts where funds (ultimately from charity money or from accounts that received charity money) appeared to be used to purchase assets including precious gems and metals.  Shenk appears to have amassed these assets during the time period when his known source of income was money received unlawfully from Charity 1 and Charity 2.  **Assets from the Safe** are forfeitable under both forfeiture bases (money laundering and wire fraud proceeds).

## CLAIMS FOR RELIEF

### First Claim for Relief
### (Forfeiture Pursuant to 18 U.S.C. § 981(a)(1)(A))

207.   The United States incorporates by reference the allegations contained in paragraphs 1 through 206 above as it set forth fully herein.

208.   The **Defendant Property** is property involved in money laundering in violation of 18 U.S.C. §§ 1956 and 1957 or traceable to such property.

209.   The **Defendant Property** is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

### Second Claim for Relief
### (Forfeiture Pursuant to 18 U.S.C. § 981(a)(1)(C))

210.   The United States incorporates by reference the allegations contained in paragraphs 1 through 206 above as if set forth fully herein.

211.   The **Defendant Property** is property which constitutes or is derived from proceeds traceable to wire fraud in violation of 18 U.S.C. § 1343.

212.   The **Defendant Property** is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

## CONCLUSION

213.   Wherefore, the United States of America prays that:

a.      Process of a Warrant for Arrest and Notice *In Rem* be issued for the arrest of the **Defendant Property** in the possession of the United States;

b.      The **Defendant Property** be forfeited and condemned to the use and benefit of the United States;

      c.     The United States be awarded its costs and disbursements in this action and for such other and further relief as this Court deems just and proper; and

      d.     That due notice be given to all parties to appear and show cause why the forfeiture of the **Defendant Property** should not be decreed.

Respectfully submitted,

JILL E. STEINBERG
UNJIITED STATES ATTORNEY

By:    <u>*/s/ J. Bishop Ravenel*</u>
       J. Bishop Ravenel
       Assistant United States Attorney
       Virginia Bar Number 70250
       P.O. Box 8970
       Savannah, GA 31412
       (912) 652-4422

## VERIFICATION OF COMPLAINT FOR FORFEITURE *IN REM*

I, Special Agent Joshua Graham, have read the foregoing Complaint for Forfeiture *In Rem* in this action and state that its contents are true and correct to the best of my knowledge and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

This 17th day of January 2024.

_____
Joshua Graham
Special Agent
Internal Revenue Service – Criminal Investigation